UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                    :
VITOL, INC.,                                                        :
                                                                    :
                                    Petitioner,                     :
                                                                    :               22 Civ. 10569 (JPC)
                        -v-                                          :
                                                                    :               OPINION AND ORDER
                                                                    :
COPAPE PRODUTOS DE PETRÓLEO LTDA,                                   :
                                                                    :
                                    Respondent.                     :
                                                                    :
--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Petitioner Vitol, Inc. ("Vitol") seeks an order compelling Respondent Copape Produtos de Petróleo Ltda. ("Copape") to arbitrate a dispute regarding the purchase and shipment of certain oil-related products to Brazil. Vitol entered into contracts with two other entities—Basoli Comércio, Importação e Exportação Ltda. ("Basoli") and Terra Nova Trading Ltda. ("Terra Nova")—for the shipment of those products. Although Copape was not a signatory of those agreements, Vitol seeks to hold Copape to the agreements' arbitration clauses. Because the undisputed facts show that Copape directly benefitted from Vitol's agreements with Terra Nova and Basoli, Copape is estopped from refusing to be bound by the arbitration clauses contained therein. Accordingly, Copape is ordered to submit to arbitration with Vitol, and Copape's cross motion to dismiss this action is denied.

## I. Background

**A.    Facts[1]**

Copape is "one of the largest final buyers of imported oil derivatives in the Brazilian market, purchasing derivatives for blending into gasoline A" and selling this product to "white flag gasoline service stations" in Brazil.  Camargo Decl. ¶ 3.  Copape has no place of business in the United States, nor is it "qualified or registered to do business in any state[,] and it has not appointed or authorized any agent for service of process in the United States."  *Id.* ¶ 4.  Vitol is a Texas corporation, with its principal place of business in Houston.  Am. Petition ¶ 2.  Vitol's "primary business is the trading and distribution of energy products globally."  *Id.*

On July 21, 2020, Fabio Basile, the Commercial Director of Vitol's Brazilian affiliate, "met with two employees of Copape, Renato Camargo and Cecilia Braga."  Basile Decl. ¶ 2.  Camargo is Copape's "sole Director and Manager."  Camargo Decl. ¶ 1.  The parties somewhat dispute what transpired at this meeting.  Basile claims that "Camargo and Braga informed [him] that Copape would be Vitol's counterparty" in deals to purchase oil derivatives from Vitol, but that because of a change in Copape's ownership, "Copape might need to use a third-party company to serve as importer on Copape's behalf," with Terra Nova possibly serving as that third-party importer.  Basile Decl. ¶ 2.  Camargo, on the other hand, insists that he made clear at this meeting that all

---

[1] "Courts deciding motions to compel [arbitration] apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the petition.  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).  "On a motion for summary judgment, the court considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Id.*  Accordingly, the following facts are taken from the allegations in the Amended Petition, Dkt. 9 ("Am. Petition"), the documents it incorporates by reference, and the declarations—including exhibits attached thereto—submitted by the parties, Dkts. 18 ("Camargo Decl."), 22 ("Basile Decl."), 28 ("Camargo Reply Decl.").  The facts are undisputed except where otherwise noted.

transactions involving Vitol and Copape "would be importation by order/*importação por encomenda* and that Copape would not be the direct buyer from Vitol."  Camargo Reply Decl. ¶¶ 2-3; *see also* Camargo Decl. ¶¶ 16-17.

Importation by order is one of "three basic methods for the sale and purchase of foreign goods into Brazil."  Dkt. 19 (joint declaration from Vitol's experts) ¶ 7.1.  To implement this method, a Brazilian company follows a two-part process.  *Id.*  The company first "hires a trading company . . . that will (1) purchase as principal and in its own name, goods from a foreign supplier; (2) [the trading company] import[s the goods]; and (3) after customs clearance (nationalization), [the trading company] resell[s] the goods to the ordering party."  *Id.* ¶ 7.1(c).  In the second part of the importation by order structure, the Brazilian company "identifies a foreign supplier willing to sell [the goods] to the [trading company] for the import-by-order process (in which all participants must cooperate); and . . . negotiates with the foreign supplier the commercial terms for each shipment of goods, for which the foreign supplier must then enter a contract between the foreign supplier, as seller, and the [trading company], as buyer of the goods."  *Id.*[2]

While the parties appear to dispute whether Vitol effectively implemented this structure, they agree that certain steps were taken in furtherance of the process.  First, on July 3, 2020, roughly three weeks before the July 21, 2020 meeting of representatives of Vitol and Copape, Copape signed a "procurement contract" with Terra Nova, a "licensed Brazilian importer," to purchase oil-related products for Copape's business.  Camargo Decl. ¶ 11; *accord* Dkt. 18-1 (Copape-Terra Nova contract).  Under this contract, Terra Nova agreed to import oil derivatives "pursuant to a formal order made by" Copape, which would "take full responsibility for all details

---

[2] Camargo explains that "[t]his procedure lowers the cost of importing goods into Brazil, as the importing-buyer qualifies for lower tax (VAT) on the goods."  Camargo Decl. ¶ 9.

3

and information for the implementation of the imports." Dkt. 18-1 at 3.[3]  "After customs clearance of the [imported] goods," Terra Nova agreed to "sell the goods to [Copape]," which in turn agreed to "purchase them for the price and terms and conditions agreed upon by the parties."  *Id.* According to Camargo, this contract was signed to have Terra Nova act as a trading company to implement the importation by order procedure.  Camargo Decl. ¶¶ 11-12.  Camargo further claims that Copape selected Vitol as the foreign supplier for the importation by order structure.  *See id.* ¶ 15.  According to Camargo, Copape would not have agreed to "directly purchas[e] and import[]" Vitol's products."  *Id.* ¶ 18.

Regardless of the exact importation structure contemplated, it is undisputed that after the initial meeting on July 21, 2020, Basile and Camargo negotiated the key commercial terms of the deals for Copape's receipt of oil derivatives sold by Vitol.  *See generally* Dkt. 6-2 (July 2020 emails between Camargo and Basile); Dkt. 22-2 (July 2020 emails between Camargo and Basile); *see also* Basile Decl. ¶ 4.  During these negotiations, Basile at one point described Copape as the "buyer" of the shipment; in response, Camargo noted that "[i]mportation [would] be done via Trading Farol, with COPAPE ordering."  Dkt. 6-2 at 2-3; *see also* Camargo Reply Decl. ¶¶ 7-9. This reference to Trading Farol, instead of Terra Nova, appears to have been an error.  *See* Camargo Decl. ¶ 19 ("In fact, the initial transactions were done with Terra Nova as the Importer."). During these negotiations, Vitol also asked Copape to provide documentation for Vitol's know-your-customer ("KYC") and compliance review.  *See* Basile Decl. ¶ 4; Dkt. 22-1 (July 2020 emails between Vitol and Copape regarding Copape's organizational documents for Vitol's KYC

---

[3] For consistency and simplicity, the Court uses the pagination generated by the Electronic Case Filing system when providing citations to the pages of exhibits of declarations filed by the parties, except when citing to Vitol's three contracts with Terra Nova and Basoli that are at issue in this case, which are cited to the page numbers on those contracts.

procedures).[4]   By July 30, 2020, Basile and Camargo had reached agreement on the basic commercial terms for an initial shipment.  *See* Dkt. 22-2 (July 29 to July 30, 2020 emails between Basile and Camargo) at 5-9.  And as of July 31, 2020, "Copape was registered in Vitol's systems as the counterparty of the" deals involving Copape.  *See* Basile Decl. ¶ 4 (citing Dkt. 22-3).

With the commercial terms set, on August 11, 2020, Basile emailed "a contract to Copape reflecting Copape as the direct buyer of the products."  Basile Decl. ¶ 5 (citing Dkts. 22-4 (email chain), 22-5 (contract emailed to Copape)).  This contract listed Vitol as the "Seller" of the relevant products and Copape as the "Buyer."  Dkt. 22-5 at 2.  The contract also included an arbitration clause, requiring that "[s]hould any dispute arise between the parties in connection with this Agreement, the matter in dispute shall be submitted by either party hereto to arbitration in New York, before three arbitrators."  *Id.* at 14.  On the same day, August 11, 2020, Braga asked if Copape needed to sign the contract, and a representative of Vitol responded that a signature was not required for "spot transactions."  Dkt. 22-10 at 3.  Then, two days later, Camargo sent an email to Basile asking for a change in the product specifications in the contract.  Basile Decl. ¶ 5; Dkt. 22-4 at 2 (Camargo writing, "I note that the attached contract contains a maximum percentage of benzene in the naptha of 1.3%.  We have to work with a maximum of 1%.  Can you change it and send a revised contract?").  The parties have not provided any response to Camargo's email.

Roughly two weeks later, individuals with a third party company, DAX Oil, contacted Vitol seeking to have DAX Oil complete Vitol's KYC procedure, and Camargo informed Basile

---

[4] Later, in March 2021, Vitol updated its KYC review of Copape and asked for current versions of Copape's organizational documents, including Copape's Articles of Incorporation, a certified or signed organizational chart demonstrating 100% of the company's beneficial ownership structure, an overview of Copape's Code of Ethics or Conduct, and information on a February 26 article (as to which the parties have not provided additional context).  *See* Dkt. 6-5 at 2-3 (March 2, 2021 email from Basile to Camargo requesting these documents).

that Copape "would use DAX Oil as its importer for Copape's purchases of products" originally sold by Vitol.  Basile Decl. ¶ 6.  But the next day, Braga informed Vitol that Terra Nova rather than DAX Oil "would be the importer for the first shipment of products sold by Vitol."  *Id.* ¶ 7 (citing Dkt. 22-7 at 2).  Vitol then completed its KYC diligence on Terra Nova, and finished registering Terra Nova in its systems on August 27, 2020.  *See* Camargo Decl. ¶ 17; Basile Decl. ¶¶ 8-9.  With the registration complete, on August 27, 2020, Basile emailed Camargo and Braga, stating that Vitol would "replace COPAPE with Terra Nova in the . . . deal" for the first shipment, for which the boat was already on its way to Brazil.  Dkt. 22-9 at 3.  In addition, Basile wrote that "[a]ll of the terms remain as agreed between Vitol and Copape," and provided a recap of the deal that would be sent to Terra Nova.  *Id.* 3-4.  In that recap, which largely focused on commercial terms such as price, quantity, and the delivery window, Basile noted, "Copape agrees that [sic] will accept Vitol['s] terms and conditions on the sale contract."  *Id.* at 4.  Camargo responded, "Okay, we're agreed on the change for Terra Nova with the conditions presented below."  *Id.* at 3. Four days later, on August 31, 2020, a representative from Vitol emailed Braga and Camargo, informing them that the previously-sent contract listing Copape as the Buyer had "been cancelled." Dkt. 22-10 at 2.  Camargo replied, asking for confirmation that the contract with Terra Nova replaced the cancelled contract.  *Id.*  Vitol's response, if any, has not been provided to the Court, but the parties do not appear to dispute that the contract between Vitol and Copape indeed was cancelled and replaced by a contract between Vitol and Terra Nova.

At this point, multiple shipments began flowing from Vitol to Copape, with the first shipment arriving on September 4, 2020, and the final shipment arriving on May 21, 2021.  Dkt. 18-4 (summary of shipments) at 2-3.  By Copape's count, Vitol made twenty-two shipments of oil

derivatives initially to either Terra Nova or another company, Basoli,[5] for ultimate receipt by Copape, pursuant to twenty-one individual contracts.   Camargo Decl. ¶ 22; *see* Dkt. 18-4 (summary of shipments with corresponding contract numbers).  Basile and Camargo continued to negotiate directly with each other regarding the commercial terms of the shipments throughout this period.  *See generally* Dkt. 6-3 (WhatsApp messages between Basile and Camargo from early September 2020 through March 16, 2021); Dkt. 6-6 (emails between Basile and Camargo in late May 2021).  The instant dispute implicates three contracts that were issued during this period.

Specifically, at issue in this case are three contracts "issued" by Vitol between December 31, 2020 and May 14, 2021 (collectively, the "Contracts"), one with Basoli and two with Terra Nova.  Am. Petition ¶ 8; Dkt. 6-1 at 25-41 ("First Contract"), 42-58 ("Second Contract"), 59-75 ("Third Contract").[6]  The First Contract was "issued" on December 31, 2020, and listed two entities as the "Parties": Vitol as the Seller and Basoli as the Buyer.  First Contract at 1.  Under the First Contract, "Vitol agreed to deliver 52,000 cubic meters of Naptha and Octane Booster to the Port of Paranguá in Brazil, which were worth approximately $30 million at the time of the agreement."  Am. Petition ¶ 10.  Payment for delivery of the two products was due "within 30 days of their delivery," which was contractually scheduled "as between March 24, 2021, and April 3, 2021."  *Id.*; *see also* First Contract at 3.

Vitol asserts that "[t]he First Contract was negotiated between Fabio Basile . . . and Renato Camargo."  Am. Petition ¶ 11.  And Camargo acknowledges that, starting in July 2020, he "negotiated the commercial terms of supply" for the products that Vitol would supply pursuant to

---

[5] On December 7, 2020, Copape "arranged" a contract with Basoli, "another independent licensed Brazilian Importer," that was similar to the one Copape already had with Terra Nova. Camargo Decl. ¶ 12; *accord* Dkt. 18-2 (Copape-Basoli contract).

[6] None of the Contracts are signed—indeed, there is no signature area on the Contracts— though the parties do not attribute any significance to this fact.

the First Contract and, as discussed below, the Second and Third Contracts.  Camargo Decl. ¶¶ 15-16; *see also id.* ¶ 19 ("Copape and Vitol only negotiated the commercial terms.").   Camargo, however, maintains that "[a]t no time had [he] ever negotiated or reviewed the terms of Vitol's *written* contracts" with Basoli and Terra Nova, *id.* ¶ 21 (emphasis added), nor had he or anyone else at Copape been sent a copy of the contracts until August 24, 2022, when Vitol sent Copape the Notice of Demand for Arbitration that eventually led to this suit (as described in greater detail below), *id.* ¶ 20.  *See id.* ¶ 26 (reiterating that "no one at Copape" had seen the Contracts until August 24, 2022); *accord* Camargo Reply Decl. ¶ 3.  Vitol does not appear to dispute that, prior to August 2022, Copape's representatives had not seen the actual written contracts with Terra Nova and Basoli listed as the Buyers, but Camargo and others at Copape had plainly been provided a copy of the largely identical contract between Copape and Vitol that was cancelled in late August, *see* Dkts. 22-4 (August 11 to August 13, 2020 email chain), 22-5 (contract emailed to Copape); *see also* Dkt. 22-9 at 3 (August 27, 2020 email from Basile to Camargo, stating that, with respect to the Vitol-Terra Nova contract that replaced the Vitol-Copape contract, "[a]ll of the terms remain as agreed between Vitol and COPAPE").

Vitol delivered the products contracted for in the First Contract—comprised of "five separate parcels on a single vessel"—to the Port of Paranguá on March 21, 2021.  Am. Petition ¶ 12.  Yet, Vitol only received payment for one parcel "after one of [the] four remaining parcels— along with the one parcel that Copape and Basoli had paid for—was seized by Brazilian customs." *Id.* ("Copape and Basoli refused to pay for the remaining four parcels . . . .").  Vitol subsequently "arranged to have [the three parcels not seized by Brazilian customs] delivered to itself so that Vitol could attempt to sell the [First Contract] Products . . . to other customers, in order to mitigate Vitol's losses."  *Id.* ¶ 13.  Vitol claims to have "incurred a significant amount" of costs as a result.

*Id.* It also avers it has yet to receive payment on the parcel seized by Brazilian customs for which it had not received payment at the time of seizure, and further asserts that neither Copape nor Basoli "took any legal action to obtain [the parcel's] release from Brazilian customs." *Id.* ¶ 14.

On May 14, 2021, the Second and Third Contracts were "issued," with both listing two entities as the "Parties": Vitol as the Seller and Terra Nova as the Buyer. Second Contract at 1; Third Contract at 1; Am. Petition ¶¶ 15, 19. The Second Contract arranged for Vitol "to deliver 52,000 cubic meters of Naptha and Aromatics . . . to the Port of Paranguá in Brazil." Am. Petition ¶ 15. According to Vitol, the delivery date under this contract "was specified as between June 26 and July 6, 2021." *Id.*; *see also* Dkt. 6-6 at 2 (May 2021 emails among Basile, Braga, and a Terra Nova employee). The version of the Second Contract provided to the Court, however, which has a header describing it is a revised contract, specifies a delivery window of September 6, 2021 to September 8, 2021. Second Contract at 1, 3. As noted below, this revised delivery window appears to reflect an amendment to the Second Contract made at the request of Copape. The Third Contract required Vitol to deliver the same quantity of Naptha and Aromatics to the same destination as the Second Contract, but with a delivery window of July 13, 2021 to July 23, 2021. Am. Petition ¶ 19; Third Contract at 3. According to Vitol, both the Second and Third Contracts also were "negotiated between Fabio Basile . . . and Renato Camargo." Am. Petition ¶¶ 16, 20.

On May 6, 2021, Camargo sent Bryan Leonardo of Vitol an email requesting that Vitol delay the upcoming shipment "as much as possible, but without generating additional costs for our operation." Dkt. 6-9 at 6. Two weeks later, on May 20, 2021, Basile emailed Camargo, Braga, and two individuals with Terra Nova email addresses to "recap" the cargo "agreed with Copape" pursuant to the Second Contract. Dkt. 6-6 at 2 (referring to "process #5146645"); *see* Second Contract at 1 (listing the Vitol reference number as 5146645). In his email, Basile listed the Seller

as Vitol and the Buyer as "Terra Nova (on behalf of Copape)." Dkt. 6-6 at 2. Basile's recap further noted that "[o]nce [Vitol] ha[s] exact specs [sic] of the products that will be loaded it shall be submitted to Copape for validation." *Id.* Similarly, he wrote that "[o]nce volume of each product is defined, Copape will inform what price to apply in each parcel. When combined, price applied per parcel shall reach the final price agreed for the whole cargo." *Id.* at 3. The next day, Lindomar dos Santos Coelho, a Terra Nova employee, responded by emailing Camargo and Braga, requesting that they "[p]lease just confirm purchase and send order signed and stamped." *Id.* at 2. On May 24, 2021, Braga replied to dos Santos Coelho, writing, "Purchase order approved." *Id.* An identical exchange occurred from May 20 to May 24, 2021, among the same individuals, but with respect to delivery under the Third Contract. *See* Dkt. 6-7.

Then, on June 9, 2021, Camargo contacted Basile, asking to again postpone the delivery dates for the Second and Third Contracts "[d]ue to some internal problems." Dkt. 6-9 at 4 (using the reference numbers for the Second and Third Contracts). Camargo requested a one-month delay for delivery under the Second Contract and about a one-and-a-half-month delay for delivery under the Third Contract. *Id.* On June 18, 2021, Basile "confirm[ed] the possibility of adjusting the [delivery] windows." *Id.* at 3. Then, on June 28, 2021, Camargo emailed Basile because Copape "needed another extension of the loading dates, of another 30 days each," with respect to the Second and Third Contracts, which would push back the delivery windows for each by another month. *Id.* On June 29, 2021, Basile again "confirm[ed] the possibility of adjusting the [delivery] windows." *Id.* The delivery dates for that third extension are reflected in the revised version of the Second Contract supplied to the Court, namely September 6, 2021 through September 8, 2021. *See* Second Contract at 3. The Court has not been provided any other revised versions of the Contracts.

10

And finally, although it is unclear whether the entire email chain has been provided, it appears that Vitol agreed to Copape's request that the delivery dates be changed once again due to the need to dock a vessel, presumably in connection with another shipment.  *See* Dkt. 6-9 at 2.  On August 10, 2021, Basile emailed Camargo the following: "As per your request, due to the uncertainty regarding the berthing date of the GW Dolphin, the delivery dates for the next two ships will be changed.  We await your information on better arrival dates so we can try to readjust the windows together."  *Id.*  Camargo then responded to Basile: "Yes, we are not able to set new dates for the next cargos at the moment, we still have the Dolphin to dock and no set date, and we cannot have even more demurrage costs beyond the costs we are already bearing so far."  *Id.*

More than a year later, on August 24, 2022, Vitol sent Copape a Notice of Demand for Arbitration (the "Notice") in which it "officially notifie[d] Copape of its intent to arbitrate the disputes set forth in the" Demand for Arbitration attached to the Notice.  Dkt. 6-11 at 5.  The Demand for Arbitration asserts four causes of action against Copape, each of which "arises from a series of [alleged] violations by Copape of its obligations under" the Contracts.  *See* Dkt. 6-1 at 1; *accord id.* at 14-18.   These violations are alleged to stem from "Copape and its agents . . . improperly tak[ing] custody of Products worth over $10.5 million without paying for them and . . . reject[ing] shipments they no longer want (even though they have no right to cancel the Contracts with Vitol) and . . . forc[ing] Vitol to expend a substantial amount in out-of-pocket costs to re-sell Products that Copape has wrongfully rejected."  *Id.* at 5.  Vitol claims that it "suffered approximately $20 million in damages" as a result of these actions.  *Id.*

The Notice invoked the following mandatory arbitration clause (the "Arbitration Clause"), included in the First, Second, and Third Contracts,[7] as the basis for requiring Copape to arbitrate the dispute:

> Should any dispute arise between the parties in connection with this Agreement, the matter in dispute shall be submitted by either party hereto to arbitration in New York, before three arbitrators.  The party initiating arbitration shall provide written notice of its intent to submit the matter for arbitration.  Such notice shall contain a statement identifying the claim for arbitration and specifying the initiating party's designated arbitrator.  Within ten (10) days following such notice of arbitration, the other party shall appoint its designated arbitrator.  If such party fails to appoint an arbitrator within the applicable 10-day period and give timely notice of such appointment to the initiating party, then the initiating party shall be entitled to specify such second arbitrator as well.  The third arbitrator shall be selected by the two arbitrators so chosen. Each party will bear and pay the cost of the arbitrator appointed by (or for) it and the cost of the third arbitrator shall be borne and paid equally by the parties.  The decision of the arbitrators shall be final, conclusive and binding on all parties.  Judgment may be entered upon any such award in any court with jurisdiction.  For disputes of less than USD 25,000, one arbitrator will be used as agreed by both parties.  If both parties fail to agree on one arbitrator, the seller will appoint a suitable arbitrator.  No arbitrator shall be an employee, representative or agent of any party and each shall be reasonably believed by the selecting party to possess the requisite experience, education and expertise in respect of the matters to which the claim relates to enable such person to competently perform such arbitral duties.

Dkt. 6-11 at 4–5; *see* First Contract at 12; Second Contract at 12; Third Contract at 13.  In response to the Notice, on September 2, 2022, Copape asserted that Vitol "has no right to arbitrate with Copape in connection with" the Contracts because the "Contracts confine arbitration to disputes arising 'between the parties,' and Copape is not such a party."  Dkt. 6-11 at 3.  A little over two weeks later, Copape further asserted, through an email from its New York counsel to Vitol's counsel, that "Vitol must have . . . the issue of whether Copape is a party to the arbitration agreements, determined by a court, before it can proceed with any arbitration with Copape."  Dkt.

---

[7] This same language also appeared in the contract between Copape and Vitol that was cancelled in August 2020.  Dkt. 22-5 at 14.

6-12 at 2.  Roughly three months later, on December 14, 2022, Vitol initiated this lawsuit.  *See* Dkt. 1.

**B.      Procedural History**

On December 14, 2022, Vitol filed its original Petition to Compel Arbitration.  Dkts. 1, 5 ("Motion"), 6.  On January 11, 2023, Vitol filed the operative Amended Petition.  Dkt. 9.  Then, on March 16, 2023, Copape filed its opposition to the Amended Petition and a cross motion to dismiss for lack of jurisdiction.  Dkts. 15, 17-19, 20 ("Opposition").  Next, on April 13, 2023, Vitol filed a reply in support of its Amended Petition and an opposition to Copape's cross motion. Dkts. 22-23, 24 ("Vitol Reply").  On May 4, 2023, Copape filed its own reply in support of its cross motion.  Dkts. 27 ("Copape Reply"), 28-29.

**II.  Discussion**

"[T]he United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'Convention') . . . governs agreements that are 'commercial and not entirely between citizens of the United States.'"  *Rep. of Ecuador v. Chevron Corp.*, 638 F.3d 384, 391 (2d Cir. 2011) (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 49 (2d Cir. 2004)) (ellipsis omitted); *see* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (June 10, 1958).  The Convention has been implemented in U.S. law in Chapter Two of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-208.   By implementing the Convention, the FAA "brings with it 'a national policy favoring arbitration of claims that parties contract to settle in that manner.'"  *Chevron Corp.*, 638 F.3d at 391 (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009)).  Thus, "[a]rbitration agreements subject to the Convention are enforced in accordance with Chapter 2 of the FAA."  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Ship. Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001) (citing 9 U.S.C. § 201).

"An agreement to arbitrate exists within the meaning of the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." *Id.* (citation omitted); *accord* 9 U.S.C. § 202. "Upon finding that such an agreement exists, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement." *U.S. Titan*, 241 F.3d at 146*; see also* 9 U.S.C. § 206. Here, there is no dispute that each of the three Contracts constitutes a written agreement; that each provides for arbitration in New York, which is in the territory of a signatory to the Convention; that the subject matter is commercial; and that the subject matter is not entirely domestic in scope being between a U.S. corporation and Brazilian counterparties. The dispute centers around whether Copape, as a nonsignatory to the Contracts, is bound by the Arbitration Clause contained therein; in other words, whether there is in fact an agreement to arbitrate between Vitol and Copape.

In this regard, the party moving to compel arbitration bears the initial burden of showing that the parties agreed to arbitrate. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (citing *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)).[8] While parties can agree to arbitrate questions about contract enforceability and scope, they cannot agree to arbitrate "threshold questions concerning contract formation." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (emphasis omitted) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)). Thus, "[t]o satisfy itself that [an] agreement [to

---

[8] Like the parties in their briefing, the Court cites to caselaw involving Chapter 1 of the FAA. *See* 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.").

arbitrate] exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock*, 561 U.S. at 297.  There is no presumption in favor of arbitrability for "disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011); *see Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (explaining that while courts must favor arbitration when parties bind themselves in an arbitration agreement, "no such special solicitude" is afforded to "the antecedent question of whether the parties actually agreed to arbitrate (that is, whether an arbitration agreement between them exists at all)" (citation omitted)).

To resolve questions of contract formation, courts look to "[s]tate law principles of contract." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016).  Here, the Contracts designate New York law as the governing law without regard to its choice of law rules.  First Contract at 11-12; Second Contract at 11-12; Third Contract at 13.  The parties also appear to agree that New York law governs this arbitrability challenge, and the Court therefore applies New York law.  *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) ("The parties' briefs assume that New York law controls this dispute, and such implied consent is sufficient to establish choice of law." (ellipses and internal quotation marks omitted)); *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (similar in a case regarding an arbitration dispute); Motion at 16; Opposition at 7; Vitol Reply at 8.  Under New York Law, a preponderance of the evidence standard applies in determining "whether the parties have agreed to arbitrate."  *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993).

### A.      Direct Benefits Estoppel

Vitol invokes the direct benefits estoppel doctrine to argue that Copape "extensively exploited the terms of the Contracts for its own benefit," and therefore should be estopped from asserting that it is not bound by the Arbitration Clause.  Motion at 10.  Specifically, Vitol points to three benefits that Copape obtained: (1) Copape secured "favorable pricing by invoking the Contracts' provision about pricing;" (2) Copape "customize[d] a supply of Products for its business based on its needs" by invoking the amendment provision in the Contracts to resolve potential disputes with Vitol as to three parcels under the First Contract and to postpone delivery dates under the Second and Third Contracts; and (3) Copape "ultimately took possession of Vitol's shipments." *Id.* at 11-12.  In response, Copape argues, *inter alia*, that any benefits it received were too indirect to justify estoppel.  Opposition at 15-20; Copape Reply at 2.

The direct benefits estoppel doctrine dictates that "a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement."  *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*, 954 F.3d 567, 572 (2d Cir. 2020) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61-63 (2d Cir. 2001)).[9]  "The benefits of exploiting the agreement, however, must flow directly from the agreement, rather than indirectly from the contractual relation of the parties to the agreement."  *Id.* (internal quotation marks and brackets omitted).  Accordingly, "[t]o be bound under a theory of direct benefits estoppel, the nonsignatory beneficiary must actually invoke the contract to obtain its benefit, or the contract must expressly provide the beneficiary with a benefit."  *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (internal quotation marks and

---

[9] The Convention does not conflict with "domestic equitable estoppel doctrines that permit the enforcement of arbitration agreements by nonsignatories."  *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1642 (2020).

brackets omitted).  The Second Circuit has found the following to be sufficiently direct benefits: "(1) the right of a foreign affiliate to use . . . [a] trade name, arising from an agreement resolving an intellectual property dispute to which that particular affiliate was not a signatory but which expressly conferred the trade name right on the affiliate; and (2) the right of a vessel owner, which had commissioned a custom racing sailboat, to take advantage of lower maritime insurance rates and to register a vessel under a particular flag."  *Id.* (citing *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1062, 1064 (2d Cir. 1993) (trade name) and *Am. Bureau of Ship. v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (maritime insurance and vessel registration)).  The Contracts did not expressly provide Copape with a benefit, nor does Vitol argue that they did.  But Copape nonetheless exploited the terms of the Contracts and received direct benefits from them such that it is estopped from arguing that it is not bound by the Arbitration Clause.

First, Copape exploited the terms of the Contract governing pricing of the product.  Each of the three Contracts contained the following language:  "Once volume of each product is defined, Buyer will inform what price to apply in each parcel.  When combined, price applied per parcel shall reach the final price agreed for the whole cargo."  First Contract at 3; Second Contract at 3; Third Contract at 3.  For the First Contract, "Buyer" was Basoli, and for the Second and Third Contracts, "Buyer" was Terra Nova.  Yet it was not Basoli or Terra Nova which submitted pricing information to Vitol; it was Copape.  *See* Am. Petition ¶ 44.  As Basile wrote in his May 20, 2021 email to individuals with Copape and Vitol, recapping an "agree[ment] with Copape" with regard to the Second Contract:  "Once volume of each Product is defined, Copape will inform what price to apply in each parcel.  When combined, price applied per parcel shall reach the final price agreed for the whole cargo."  Dkt. 6-6 at 2-3.  Also on May 20, 2021, Basile sent the same recipients an

17

identical email with respect to the Third Contract.  Dkt. 6-7 at 2-3.  In other words, in two emails on May 20, 2021, Basile recapped Vitol's agreement with Copape with respect to deliveries under the Second and Third Contracts, which entailed using verbatim language contained in those Contracts regarding pricing for parcels in the shipments, with the only change being substituting Copape for Terra Nova, the signatory Buyer of those Contracts.  Copape's provision of pricing information to Vitol in turn benefited Copape by allowing it to eventually purchase each parcel of the products, which were essential for its business, at a desired price (provided the total price reaches the agreed-upon price for the entire cargo).[10]

Next, Copape exploited the Contracts by invoking each's amendment provision to agree directly with Vitol to alter certain terms.  *See* First Contract at 13 ("No variation or modification of this Agreement shall be effective unless it is in writing and agreed by the parties (or their authorized representatives)."); Second Contract at 13 (same); Third Contract at 14 (same).  With respect to the First Contract, Copape worked with Vitol to amend the agreement to resolve a brewing dispute concerning the delivery of the parcels.  As discussed above, the shipment under the First Contract was to consist of five parcels on a single vessel which arrived at the Port of Paranguá on March 21, 2021.  Am. Petition ¶ 12.  Yet, after two of those parcels were seized by Brazilian customs, Copape refused to pay for four of the parcels.  *Id.* ¶ 13.  Camargo then engaged in discussions with Basile to amend the agreement to resolve this issue.  In an email sent to Basile and others on July 14, 2021, which specifically identified the contract number for the First Contract (along with another contract number), *see* Dkt. 6-8 at 6; First Contract at 1, Camargo referenced

---

[10] Copape does not dispute that it provided this pricing information to Vitol, but argues that it is not material to the direct benefits estoppel analysis:  "Nor does providing pricing information to be used in conjunction with the execution of the Vitol/Basoli and Vitol/Terra Nova contracts constitute a direct benefit or permit Copape source materials at prices it chooses."  Opposition at 20 (internal citation, quotation marks, and ellipse omitted).

"our discussion and [Basile's] emails of yesterday and July 2, proposing terms for the parties' agreement (Procedure) for avoiding and minimizing loss and damage." Dkt. 6-8 at 6. Among other things, Camargo confirmed that "the Procedure does not terminate, *but amends the Agreements*. It does not release any party from its obligations under the respective Agreements. No rights and claims are waived by the Procedure which is agreed without prejudice as to all parties and under a full reservation of all rights, claims and remedies of not just Vitol, but of all parties and their affiliates under the Agreements or otherwise." *Id.* (emphasis added). The email set forth amounts that "Basoli and/or Terra Nova" would pay Vitol, and further provided that upon receiving confirmation of the payment, Vitol "will berth Salacgriva [presumably, the vessel] and cooperate fully in the loading." *Id.* at 6-7. Thus, Copape exploited the amendment provision of the First Contract to settle certain outstanding demurrage charges, avoid termination of the Contracts, and secure supply of needed materials for its business. *See also* Dkt. 6-8 at 4 (July 14, 2021 email in which Camargo asked Basile to proceed: "We are in agreement, please proceed with the mooring so as not to lose the window."). This all directly benefited Copape.

With respect to the Second and Third Contracts, Copape negotiated with Vitol to amend those Contracts to allow for delays in the shipments. As discussed above, on May 6, 2021, Camargo asked Leonardo at Vitol to "[p]lease delay [the shipment] as much as possible, but without generating additional costs for our operation." Dkt. 6-9 at 6. As those Contracts specified delivery windows, *see* Second Contract at 3; Third Contract at 3, an amendment was necessary to alter the delivery dates. Then, on June 9, 2021, Camargo again asked Basile to postpone the delivery dates for the Second and Third Contracts, on account of "some internal problems." Dkt. 6-9 at 4. On June 18, 2021, Basile confirmed that it would be possible to adjust those delivery windows, resulting in a further delay of one month under the Second Contract and about one-and-

19

a-half months under the Third Contract.  *Id.* at 3.  Then on June 28, 2021, Camargo asked Basile

for another delivery delay, this time asking for an additional thirty days under both Contracts,

which Basile again confirmed was possible.  *Id.*  In fact, this amended delivery window is reflected

in the version of the Second Contract filed in this case.  *See* Second Contract at 3.  And then, Vitol

agreed to another delivery delay on August 10, 2021, on account of "uncertainty regarding the

berthing date of the GW Dolphin."  Dkt. 6-9 at 2.  In responding to Basile on this delay, Camargo

made clear that it was to Copape's financial benefit for the deliveries to be delayed: "Yes, we are

not able to set new dates for the next cargos at the moment, we still have the Dolphin to dock

and no set date, and *we cannot have even more demurrage costs beyond the costs we are already*

*bearing so far*."  *Id.* (emphasis added).

     In opposing application of direct benefits estoppel, Copape's arguments hinge largely on

its reading of the Second Circuit's decision in *Trina Solar*, which reversed the district court's

application of the doctrine.  *See* Opposition at 16-17.  There, the Second Circuit concluded that a

nonsignatory should not be estopped from arguing it was not bound by an arbitration provision,

even though the nonsignatory "benefited from the contractual relationship" by "receiv[ing] solar

panels sold by [the plaintiff] to the [counter signatory to the contract in question]."  *Trina Solar*,

954 F.3d at 572.  The contract in *Trina Solar* included a provision that "explicitly provide[d] that

'nothing in the Contract is intended to confer on any person who is not a party hereto any right to

enforce any term of this Contract.'"  *Id.* at 573 (brackets omitted); *see* First Contract at 13 ("Each

party confirms it is acting on its own behalf and not for the benefit of any other person."); Second

Contract at 13 (same); Third Contract at 14 (same).

     The facts here, however, are easily distinguishable from those in *Trina Solar*.  In declining

to invoke direct benefits estoppel, the Second Circuit explained "there [was] no record evidence

that [the nonsignatory] ever invoked the Contract to demand delivery." *Trina Solar*, 954 F.3d at

572.  Nor was there evidence in *Trina Solar* that the nonsignatory "ever invoke[d the signatory's]

duties under the Contract to seek or obtain a benefit."  *Id.* at 573.  In contrast and as discussed at

length above, Copape repeatedly "invoke[d Vitol's] duties under the Contract to seek or obtain a

benefit."  *Id.* at 573.  Indeed, a key question in *Trina Solar* was whether the nonsignatory invoked

a contractual provision.  Copape did so; the nonsignatory in *Trina Solar* did not.   In addition, by

providing pricing information per parcel of the shipment, Am. Petition ¶ 44; *see* Opposition at 20,

Copape engaged in more active conduct than "reviewing purchase orders" as in *Trina*, while also

invoking a right afforded to Basoli and Terra Nova under the Contracts.  *See* First Contract at 3

("Once volume of each product is defined, Buyer will inform what price to apply in each parcel.");

Second Contract at 3 (same); Third Contract at 3 (same).[11]

Copape's repeated invocation of rights under the Contracts to its benefit is dispositive.  But

in addition, the posture of Copape, Vitol, Terra Nova, and Basoli bears some similarities to the

relationships in *Tencara Shipyard S.P.A.*, where the Second Circuit reversed the district court's

failure to apply direct benefits estoppel.  In *Tencara Shipyard S.P.A.*, a company contracted with

a shipyard to construct a vessel, and the shipyard then contracted with a third party to secure certain

certifications.  170 F.3d at 351.  The certifications, in turn, allowed the purchasing company to

---

[11] Copape's reliance on *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 401
(S.D.N.Y. 2018), for the proposition that "mere ownership" of a signatory is insufficient to compel
a nonsignatory to arbitrate, Opposition at 18, is beside the point.  Vitol does not purport to argue
that Copape owns Terra Nova or Basoli and therefore was bound by the Contracts.  In fact, the
court in *WTA Tour* held that the direct benefits estoppel doctrine did apply in circumstances lacking
the type of direct invocation present here.  *See id.* at 401-02 (holding that the nonsignatory was
bound due to "direct reputational benefit" the nonsignatory received through of the contract in
question).  Similarly, the proposition that "the mere fact of a nonsignatory's affiliation with a
signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close
the affiliation is," *Gater Assets*, 2 F.4th at 68; *see* Opposition at 18, has no application to the
Court's analysis here.

obtain lower insurance rates for the vessel and sail under the French flag. *Id.* at 353. The contract between the third party and the shipyard contained an arbitration clause, *id.* at 351, and the Second Circuit found that the purchasing company, despite not having signed the contract between the shipyard and the third party, was bound by that arbitration clause due to the two aforementioned direct benefits it received as a result of the contract. *Id.* at 353. Here, as Copape's own expert declaration makes clear, *see* Dkt. 19 ¶ 7.3(d), Copape effectively outsourced the costs of preparing the customs and tax documentation associated with importing the products to Terra Nova and Basoli to streamline those aspects of its business—which, by Copape's own admission, "lowered the cost of importing goods into Brazil," Camargo Decl. ¶ 9—while still ultimately taking possession of the imported products. This is analogous to the receipt of lower insurance rates in *Tencara Shipyard S.P.A.* In addition, as in *Tencara Shipyard S.P.A.*, Copape did in fact receive a copy of the language of the Arbitration Clause in the subsequently-cancelled version of the contract that listed Copape as the Buyer. *See* Basile Decl. ¶ 5 (referencing Dkt. 22-5, the draft contract sent to Copape); *accord* Dkt. 22-4 (contract sent to Braga and then commented on by Camargo in August 2020); *see also* Dkt. 22-9 at 3 (August 27, 2020 email from Basile to Camargo stating that, with respect to the Vitol-Terra Nova contract that replaced the Vitol-Copape contract, "[a]ll of the terms remain as agreed between Vitol and COPAPE"). Thus, even if Copape did not receive the specific Contracts at issue prior to receiving the Notice, it was aware of the Arbitration Clause contained in those agreements. *See Deloitte Noraudit A/S*, 9 F.3d at 1064 (holding that the direct benefits estoppel doctrine applied where the nonsignatory received the agreement containing the arbitration clause, offered no objection to it, and "knowingly accepted the benefits of the Agreement").

Copape's other arguments fare no better.  Copape relies on the fact that the specific amendment provision of the Contracts was not explicitly cited in the July 2021 email from Camargo to Basile in which he noted that the "Procedure" would amend the "Agreements," and also asserts that Copape was not, in fact, invoking the amendment provision for its benefit. Opposition at 20.  A party need not expressly cite a contract provision by identifying the exact paragraph number or page of the agreement to invoke the provision; the amendment provision was invoked by both Vitol and Copape because they relied on that provision to be able to amend the agreements to accommodate their respective needs.  And as discussed, Copape repeatedly requested adjustment of the delivery windows set forth in the Second and Third Contracts, thereby looking to change a term of those Contracts.  Further, as discussed above, the various amendments to the Contracts were to Copape's benefit.  Indeed, it defies logic that Copape, as a sophisticated and rational business actor, would have requested those amendments unless doing so was in its interests.

Finally, Copape's argument that negotiation of the Contracts does not create estoppel, Opposition at 19, attacks a straw man.  The determinative fact is Copape's invocation of the Contracts' provisions *after* the Contracts had already been signed, not any involvement from Copape during the negotiation leading up to the signing of the Contracts.  Similarly, while Copape notes that payment between a signatory and a nonsignatory does not itself establish that the nonsignatory received sufficiently direct benefits for estoppel to apply, *see Downing v. A&E TV Networks, LLC*, No. 20 Civ. 4747 (KMW), 2021 WL 4131652, at *3 (S.D.N.Y. Sept. 10, 2021) (citing *Trina*, 954 F.3d at 572), this Court's ruling does not hinge on any such payments.[12]  And

---

[12] It is unclear whether Copape ever paid Vitol directly.  Although the exchange between Basile and Camargo in mid-July 2021 indicates that Vitol received funds due, *see* Dkt. 6-8 at 4

the bases for estoppel are examined independently of whether the contractual language excludes the nonsignatory as a party.  *See Trina*, 954 F.3d at 572-73 (considering estoppel independently from language excluding nonsignatory as party to the contract).

**B.    Scope of Arbitration Clause**

Copape also argues that even if it is bound by the Arbitration Clause, the instant dispute does not fall within the scope of that clause.  Opposition at 21-24.  Specifically, it argues that the because the Arbitration Clause applies to disputes that arise "between the parties," and Copape is not a named party to the Contracts, a dispute between Vitol and Copape is not covered by the Arbitration Clause.  *Id.* at 23-24.[13]  In response, Vitol contends that Copape cannot avoid the Arbitration Clause by virtue of this language, and that any dispute on this question must be decided by the arbitration panel.  Vitol Reply at 22-23.

In general, even if a party is estopped from arguing that it is not bound by an arbitration clause, the Court must still assess whether the instant dispute is covered by that clause unless that question has been clearly and unmistakably delegated to the arbitrator to decide.  *See Olin Holdings Ltd. v. State of Libya*, 73 F.4th 92, 105 (2d Cir. 2023) ("[C]ourts presume that the parties intend

---

(Basile stating that Vitol "confirmed funds received"), the exchange does not expressly reveal that the funds came directly from Copape and the Court declines to draw that inference in favor of the moving party.  There is evidence of payments in the form of bank transfer confirmations of payments from Basoli to Vitol.  *See* Dkt. 18-10.  And, according to a declaration from Camargo, "[f]or each shipment made by Vitol, the Importer [*i.e.*, Terra Nova or Basoli] paid Vitol under its contract with Vitol, and Copape paid the Importer pursuant to its separate contract with the Importer."  Camargo Reply Decl. ¶ 6.  Yet, Camargo agreed in an October 7, 2021 email to terms that appeared to amend the First Contract in which Copape was to make payments to Vitol.  *See* Dkt. 18-11 at 3-4.  And, after agreeing to such terms, Camargo stated that "we will make the payment and promptly send the swift for clearance to Vitol's endorsement."  *Id.* at 2.  Given this ambiguity, the Court's ruling does not rely on the existence *vel non* of any payments directly from Copape to Vitol.

[13] Copape also argues that the Contracts should be construed against Vitol because Vitol drafted the Contracts, but provides no evidence in support of that contention.  Opposition at 7.  The court therefore declines to construe the terms of the Arbitration Clause against Vitol.

courts, not arbitrators, to decide disputes about arbitrability. . . . Courts are required to independently decide those issues unless the record supplies clear and unmistakable evidence that the parties agreed to submit the issue to arbitration." (internal quotation marks, citations, ellipses, and brackets omitted)); *Deloitte Noraudit A/S*, 9 F.3d at 1064-65 (first holding that a nonsignatory was estopped from "denying its obligation to arbitrate" and then assessing whether arbitration provisions applied to the instant dispute); *Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. Quinn & Assocs., L.L.P.*, 523 F. App'x 761, 764 (2d Cir. 2013) (similar).

The Second Circuit recently clarified how courts should assess whether a particular dispute falls within the scope of an arbitration clause. First, "[o]rdinary principles of contract law guide the inquiry into . . . whether the parties consented to arbitrate a particular dispute." *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (citing *Granite Rock Co.*, 561 U.S. at 299). Second, if after applying ordinary principles of contract law, "a court finds that the . . . agreement is ambiguous about whether it covers the dispute at hand, the court may apply a presumption of arbitrability. The presumption, however, is rebuttable and simply assists in resolving arbitrability disputes." *Id.* (internal quotation marks omitted).[14]

As an initial matter, the record contains no indication of a clear and unmistakable intent for an arbitrator to decide whether this dispute falls within the Arbitration Clause. The key contractual language reads: "Should any dispute arise between the parties in connection with this Agreement, the matter in dispute shall be submitted by either party hereto to arbitration in New York, before

---

[14] Following the Supreme Court's decision in *Granite Rock*, a framework previously employed in this Circuit—under which courts first classified an arbitration clause as broad or narrow and then applied a presumption of arbitrability *vel non* based on that classification—no longer governs. *See Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO*, 67 F.4th at 113-14.

three arbitrators." First Contract at 12; Second Contract at 12; Third Contract at 13. The Contracts do not incorporate rules, such as those of the American Arbitration Association, that dictate that the question of arbitrability be decided by an arbitrator. *Cf. Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005) ("We therefore conclude that as a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules, Remote Solution cannot now disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability."). Nor is there language indicating that questions regarding the "enforcement" or "interpretation" of the Contracts must be decided by an arbitrator. *Cf. Mrinalini, Inc. v. Valentino S.p.A.*, No. 22 Civ. 2453 (MKV), 2023 WL 2307479, at *4-5 (S.D.N.Y. Mar. 1, 2023). It therefore falls to the Court to consider Copape's argument that the dispute does not fall within the scope of the Arbitration Clause.

As Copape points out, the express language of Arbitration Clause provides that "any dispute [that] arise[s] in connection with this Agreement" must be submitted to arbitration. First Contract at 12; Second Contract at 12; Third Contract at 13. Each Contract lists two parties: Vitol and either Terra Nova or Basoli. First Contract at 1; Second Contract at 1; Third Contract at 1. The question is therefore whether Copape can be compelled to arbitrate under a direct benefits theory of estoppel notwithstanding this contractual language.

It would be discordant to allow Copape to evade estoppel and escape arbitration by limiting the Arbitration Clause in the manner Copape advocates. The direct benefits theory of estoppel is based in equity, *see Gater Assets*, 2 F.4th at 68 (referring to direct benefits estoppel as an "equitable doctrine"), and dictates that a party that secures benefits from a contract either by express provision of the contract or by invoking the contract cannot then escape the duties associated with that contract. It would eviscerate this principle to allow a non-party who invokes the contractual terms

and directly benefits from doing so to then avoid arbitration by virtue of being a non-party to that contract.  Indeed, Copape's argument essentially repackages its basic opposition to the application of the direct benefits estoppel doctrine.

The Court's determination is consistent with the case law cited by the parties. Vitol relies on *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *15-16 (S.D.N.Y. Sept. 16, 2020), where the court found that a nonsignatory was bound to similar language based on another theory of estoppel.  *Id.* at *17.[15]  Copape argues that in *Convergen* the court declined to rule on the scope of the arbitration clause, which is only partially correct—the court determined that the nonsignatories were bound by the arbitration clause, and then deferred to the arbitrator on the question of whether the instant claims qualified as a dispute "arising . . . in connection with" the relevant agreement.  *Id.* at *16.  Thus, *Convergen* is consistent with the Court's determination here that Copape cannot evade arbitration by virtue of the Arbitration Clause's references to "the parties."  In addition, Copape has not argued here that the claims set forth in the Notice do not reflect a "dispute . . . in connection with" the Contracts.[16]

---

[15] The Court does not rely on the portion of *Convergen* that applied a two-step framework for assessing the scope of arbitration clauses in light of the Supreme Court's abrogation of that framework in *Granite Rock*.  *See Niagara Mohawk Power Corp.*, 67 F.4th at 113-14; *see also supra* n.15.

[16] Copape's reliance on *Serebryakov v. Golden Touch Transportation of NY, Inc.*, No. 12 Civ. 3990 (NGG), 2015 WL 1359047 (E.D.N.Y. Mar. 24, 2015), is not persuasive.  *See* Opposition at 21-23.  In *Serebryakov*, the court found that the dispute did not fall within the scope of an arbitration clause and therefore did not reach the question of whether direct benefits estoppel bound a nonsignatory.  *See* 2015 WL 1359047, at *5 (not reaching direct benefits estoppel issue), 6-13 (scope of arbitration clause analysis).  The court in *Serebryakov* therefore did not need to contend with the situation presented here, where direct benefits estoppel does apply.

Accordingly, the Court finds that the Arbitration Clause's limitation to disputes "between the parties" does not preclude arbitration between Vitol and Copape regarding the underlying dispute.[17]

## C.   Personal Jurisdiction

Copape also moves to dismiss this case under Federal Rule of Civil Procedure 12(b)(2) because, it claims, the Arbitration Clause does not bind Copape and this Court therefore lacks personal jurisdiction over Copape.  Opposition at 24-25.  The Arbitration Clause states that any covered dispute will be arbitrated in New York.  First Contract at 12; Second Contract at 12; Third Contract at 13.  Thus, the Court has jurisdiction "regarding proceedings relating to enforcement of the arbitration agreement."  *Pharma Partners, LTD v. Liposeuticals Inc.*, No. 19 Civ. 5735 (AJN), 2020 WL 2836771, at *2 (S.D.N.Y. June 1, 2020) (quoting *Mariac Shipping Co., Ltd. v. Meta Corp.*, No. 05 Civ. 2224 (LAK), 2005 WL 1278950, at *1 (S.D.N.Y. May 27, 2005), and collecting cases).  This litigation is limited to Vitol's motion to compel arbitration, and the Court has jurisdiction over Copape for the purposes of issuing an order compelling it to arbitrate.  *See Tencara Shipyard S.P.A.*, 170 F.3d at 352 ("[I]f the Owners are estopped from denying their obligations under the arbitration agreement between Tencara and ABS, it follows that they are also estopped from asserting a lack of personal jurisdiction based on that agreement.").  Accordingly, Copape's motion to dismiss for lack of personal jurisdiction is denied.

---

[17] Vitol also claims that Copape is bound by the Arbitration Clause because Basoli and Terra Nova entered into the Contracts "on behalf of and with an intent to bind Copape, and they had actual and apparent authority to do so."  Motion at 12.  Because the Court finds that Copape is estopped from arguing that it is not bound by the Arbitration Clauses, the Court does not reach these agency arguments.

### III.  Conclusion

Accordingly, Vitol's petition to compel arbitration is granted, and Coppape's cross motion to dismiss is denied.  Copape is ordered to enter arbitration between it and Vitol.  By April 4, 2024, the parties shall submit a joint letter with their views as to whether this litigation should be dismissed, otherwise terminated, or stayed in light of the Court's ruling.  *See Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 858 n.2 (2d Cir. 2020) (noting that the Second Circuit "traditionally counsel[s] that courts should stay litigation pending arbitration to avoid 'convert[ing] an otherwise-unappealable interlocutory stay order into an appealable final dismissal order,' thus 'enabl[ing] parties to proceed to arbitration directly'" (second two alterations in original) (quoting *Katz v. Cellco P'ship*, 794 F.3d 341, 345, 346 (2d Cir. 2015))); *see also Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 664 (2d Cir. 2022) (Jacobs, J., concurring) ("Following *Katz*, courts in this Circuit are split on whether a stay is required even if no party requests one."), *cert. granted*, 144 S. Ct. 479 (2023).  In the event the parties agree that this litigation be terminated, the parties are directed to submit a proposed judgment.  The Clerk of the Court is respectfully directed to close the motion pending at Docket Number 15.

SO ORDERED.

Dated: March 21, 2024
      New York, New York

                                    JOHN P. CRONAN
                           United States District Judge